## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Tynnetta D. Kelly | : | Civil Action |
| Tiffany Gilbert | : | |
| Telissa Lindsey | : | No.: |
| Cheryl Ingram | : | |
| Crystal Tucker | : | |
| Tracey Parker | : | |
| Tanya Gregory | : | Jury Trial Demanded |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| Vanguard Group, Inc. | : | |
| Defendant. | : | |

### COMPLAINT- CIVIL ACTION

Plaintiffs, Tynnetta D. Kelly, Tiffany Gilbert, Telissa Lindsey, Crystal

Tucker and Tanya Gregory ("Plaintiffs") by and through their undersigned counsel,

bring the instant action seeking relief from the employment discrimination of

Defendant, Vanguard Group, Inc. ("Vanguard"), and make the following allegations.

### JURISDICTION AND VENUE

1.      This Court has original jurisdiction to hear this complaint and adjudicate

the claims stated herein under 28 U.S.C. §§ 1331 and 1343, this action being brought

under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Civil Rights Act of 1991,

Pub. L. 102-166, 105 Stat. 1071 (Nov. 21, 1991) to redress and enjoin the

discriminatory practices of Vanguard.

2.      Plaintiffs have or will timely file charges of race and/or sex discrimination

with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania

Human Relations Commission ("PHRC") where applicable, and will request at the

appropriate time Notice of Right to Sue letters from the EEOC ("Right to Sue Letters").

Once received, Plaintiffs will seek to amend their Complaint by naming any additional

defendants adding claims of race and sex discrimination and retaliation under Title VII

of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act, 43 P.S. §

951, et. Seq., within 90 days of receipt of the Right to Sue Letters.

3.     Venue is proper in the Eastern District of Pennsylvania by reason of 28

U.S.C. § 1391 (b) because a substantial number of the acts and omissions that give rise

to this Complaint occurred in this judicial district.

## PARTIES

4.     Plaintiff, Tynnetta D. Kelly, is an African American female residing in

Philadelphia, Pennsylvania.  She worked at Vanguard from November 7, 2005 to

August 30, 2010 when she was constructively discharged because of the racially hostile

environment and discriminatory practices of Vanguard.

5.     Plaintiff, Telissa Lindsey, is an African American female residing in

Philadelphia, Pennsylvania.  She worked at Vanguard from July 18, 2005 to September

4, 2010 when she was constructively discharged because of the racially hostile

environment and discriminatory practices of Vanguard.

6.     Plaintiff, Tiffany Gilbert, is an African American female residing in

Philadelphia, Pennsylvania.  She worked at Vanguard from December 22, 2004 until on

or about May 2011, when she was unlawfully terminated following short term disability

and administrative leave from Vanguard.  She had been subjected to a racially hostile

work environment and discriminatory conduct by Vanguard in performance evaluations,

disciplinary practices and her compensation.

7.     Plaintiff, Crystal Tucker, is an African American female residing in Downingtown, Pennsylvania.  She worked at Vanguard from October 2000 to October 2009 when she was constructively discharged because of the racially hostile environment and discriminatory practices of Vanguard.

8.     Plaintiff, Tracey Parker, is an African American female residing in Coatesville, Pennsylvania.  She worked at Vanguard from May 2008 to September 2010 when she was constructively discharged because of the racially hostile environment and discriminatory practices of Vanguard.

9.     Plaintiff, Tanya Gregory, is an African American female residing in Sicklerville, New Jersey.  She worked at Vanguard from February 22, 2005 to November 8, 2010 when she was constructively discharged because of the racially hostile environment and discriminatory practices of Vanguard.

10.     Plaintiff, Cheryl Ingram, is an African American female residing in Philadelphia, Pennsylvania.  She has been employed at Vanguard as an Annual Plan Reporting Associate since December 2006.  She has been subjected to a racially hostile work environment and discriminatory conduct by Vanguard in performance evaluations, disciplinary practices and her compensation.

11.     Defendant, Vanguard, is an investment management company that manages approximately $1.4 trillion in investment assets located at 100 Vanguard Blvd., Malvern, Pennsylvania.  Vanguard offers mutual funds and other financial products and services to individual and institutional investors in the United States and abroad.

12.    Vanguard fosters a racially hostile environment and discriminates against its Black[1] employees and against Black women in particular in its performance evaluations, disciplinary procedures, departmental transfers and demotion and promotion procedures and compensation policies.  Vanguard employs facially neutral policies that allow its managers broad discretion to act in a discriminatory manner against its Black employees and Black women employees, creating a pattern of discriminatory employment practices.

13.    Vanguard's facially neutral policies are used to create and foster a corporate climate of intolerance, which encourages stereotypical beliefs and which disproportionately impacts its Black employees, who make up a noticeably small proportion of Vanguard's employees and who are significantly underrepresented at Vanguard's Malvern headquarters.

14.    For example, Vanguard has created a nautical theme, which permeates its corporate culture.  The company lunchroom is referred to as "the Galley", the company fitness center is called "Ship Shape" and its employees are referred to as "Crew".

15.    However, beneath this ostensibly neutral nautical façade exists a culture of isolation and discrimination against Black employees who are perceived by Vanguard

---

[1] Although the Plaintiffs are all African American women, the racist subculture at Vanguard does not necessarily distinguish between Black people from different parts of the African Diaspora – that is, Black people of all national origins are all equally treated with disdain and disrespect at Vanguard and, as further noted herein, the assumption that pervades the Caucasian management team at Vanguard about the inferiority of Black employees is directed at Black people from America as well as Black people from African nations or other countries.  Therefore, the use of the term Black is meant to encompass African Americans as well as other people of recent African descent.

management as not representative of the culture at Vanguard and are treated accordingly.

16.    Indeed, Vanguard treats many/most of its Black employees as outcasts rather than as valued or necessary members of the "Crew."

17.    Vanguard management condones and perpetuates a pattern of discrimination against Black and Black women employees and, then, retaliates against Black employees who complain about illegal race discrimination.

18.    Vanguard also has a facially-neutral internal complaint process, through which an employee can report wrongdoing or violations of company policy, such as allegations of discrimination or harassment. This process involves complaining to a representative of Vanguard Crew Relations ("Crew Relations"). However, Crew Relations simply attempts to placate Black employees who complain of discrimination and, then, dismisses their complaints with no investigation or follow up. Vanguard also purports to offer to employees the option to complain to a managing director in the Human Resources Division about incidents of discrimination or harassment. However, members of Vanguard's management, even at the highest levels, mostly ignore complaints by Black employees of discrimination or harassment.

19.    Vanguard's inaction with regard to discrimination complaints and its tolerance of retaliatory conduct against those who do complain communicates to its employees that Vanguard does not have or does not enforce a reasonably effective anti-discrimination or anti-retaliation policy, which further dissuades African American employees from making or supporting charges of discrimination.

20.   Vanguard's discriminatory practices have created and fostered a corporate culture of racially-charged stereotypes, beliefs and actions detrimental to its Black employees. Plaintiffs, individually and collectively, have been disproportionately impacted by Vanguard's corporate culture of willful blindness as it relates to discrimination, harassment and retaliation and Plaintiffs have suffered substantial economic loss, pain and suffering.  Plaintiffs seek compensatory and punitive damages and all other available statutory relief under federal and state law.

## ALLEGATIONS APPLICABLE TO ALL PLAINTIFFS

21.   At all times material hereto, Plaintiffs performed their job-related duties in a fully satisfactory manner.

22.   At all times material hereto, Plaintiffs were subjected to a racially divisive and hostile work environment at Vanguard.

23.   Plaintiffs have collectively experienced numerous instances of disparate, racially divisive and hostile treatment including pervasive, demeaning statements made by Caucasian supervisory employees about African Americans to Plaintiffs directly, or to other employees while in the presence of Plaintiffs.

24.   Plaintiffs reported the discriminatory treatment to their supervisors and/or Crew Relations, however, their complaints were dismissed without investigation or given cursory review and deemed insignificant.

25.   Because, during all relevant times, so few African American employees have worked in the Malvern, Pennsylvania office of Vanguard, the pervasive discriminatory animus that has been directed toward each of them individually is further exacerbated by the similar racially hostile environment experienced by their

African American colleagues, which Vanguard has persistently ignored and, in fact, has fostered.

26. That is, each Plaintiff has been deeply impacted by the discriminatory treatment and hostility directed at other Black employees, including their co-Plaintiffs, as such treatment signals Vanguard's utter disdain for Black people and its disregard for their civil rights, discouraging each of them from making or supporting their own charges of discrimination.

27. The specific racially hostile work environment experienced by all of the Plaintiffs during their employment with Vanguard includes, but is not limited to, the following examples:

a) Caucasian supervisors treating Plaintiffs in a condescending and offensive manner while treating Caucasian subordinates respectfully and in a manner to ensure their professional growth and success (notably, the Caucasian supervisors who have discriminated against Plaintiffs are all trained in Vanguard's institutionally racist culture that subliminally, and in some cases overtly, espouses the inferiority of African Americans and all are fully informed of Vanguard's non-enforcement of any reasonably effective anti-discrimination or anti-retaliation policy);

b) Caucasian management at Vanguard purposefully creating an environment in which Plaintiffs and other African American employees would fail by taking away work assignments and/or placing Plaintiffs into employment positions without the proper and necessary training and guidance;

c) Caucasian supervisors making demeaning comments about people of African descent such as stating to a Sudanese-American employee in the presence of

7

other employees, "Listen, I don't know how else to explain this to you. . . . I don't speak that goopdeega that you speak," without reprimand or apology;

d)      Caucasian supervisors making demeaning comments about the intelligence of African Americans, including telling Plaintiffs directly or implying that Plaintiffs were not intelligent enough to do the work and making derogatory generalizations such as "African American people only eat fried chicken because they are not intelligent enough to discern healthy food";

e)      Caucasian supervisors displaying an open distrust for Black employees such as accusing an African American employee of "faking" a diagnosis of leukemia even though he provided medical records confirming the diagnosis;

f)      Caucasian supervisors accusing Plaintiffs and other Black employees of not getting along with Caucasian employees, of not being team players, or not fitting into the "Vanguard mold";

g)      Caucasian supervisors openly admitting bias against Black employees with regard to their promotions including statements such as "ethnic" hair styles could affect whether an employee was successful at Vanguard and such as "there are a lot of Black women around here in positions over their heads and they don't know what they are doing";

h)      Caucasian managers minimizing the complaints of African Americans about Vanguard's failure to promote them such as by stating to other employees that an African American male employee was "a wuss" for being upset when he was not selected for a management position that was given to a Caucasian female candidate

8

and questioning the African American male's ability to pass security licensing examinations in contrast to his Caucasian female counterpart;

     i)     Caucasian managers demeaning Black men such as by stating that Black men "will mooch off you" but that they are "well endowed";

     j)     Permitting Caucasian employees to place and display a confederate flag in a conference room during meetings in which supervisory employees were present and aware of such racially hostile symbols, which were offensive and threatening to Plaintiffs and other African Americans;

     k)     Routinely ignoring complaints of discriminatory conduct and routinely failing to enforce anti-discrimination and/or anti-retaliation policies.

     26.     The acts alleged above constitute violations of 42 U.S.C. § 1981.

     27.     By reason of Vanguard's discrimination, the Plaintiffs have suffered extreme harm, including loss of compensation, wages, back and front pay, bonuses, and other employment benefits, as well as other compensatory damages, including mental anguish, embarrassment, humiliation and pain and suffering.

     28.     Vanguard has acted, and failed to act, with reckless disregard for the Plaintiffs' federally protected rights.

     29.     Plaintiffs demand trial by jury of all issues so triable, and an award of compensatory and punitive damages, prejudgment interest, attorneys' fees, costs, and expenses and whatever other equitable relief the Court deems proper.

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS AGAINST VANGUARD

     30.     In addition to suffering the discriminatory treatment and racially hostile environment described above, each of the individual Plaintiffs suffered other

discriminatory acts at the hands of their individual supervisors, which emanated from the general culture of racial intolerance at Vanguard's Malvern location.

## TYNNETTA D. KELLY

31.    Plaintiff Tynnetta D. Kelly ("Kelly") began her career at Vanguard in November 2005 as a Communications Administrator in Vanguard's Malvern, Pennsylvania location.

32.  As a Communications Administrator, Kelly's duties included, *inter alia*, writing and editing articles, working with business departments at Vanguard to develop communication strategies for specified programs and services and providing content for intranet sites for various Vanguard departments.

33.    Kelly was the only African American Communications Administrator in her department.

34.    Throughout her employment at Vanguard, like all of the Plaintiffs in this action, Kelly was treated in a condescending and offensive manner by her Caucasian supervisors while her Caucasian counterparts were not.

35.    For example, Kelly was involuntarily transferred to the Business Integration Services Department where her duties were drastically changed from writing publications for Vanguard's intranet site to designing and creating web pages on Vanguard's intranet even though she had no web design experience and was not offered any training.

36.    Kelly spoke with her supervisor, Sandra McClellan ("McClellan"), a Caucasian female, and told her that she was not experienced enough to design and

create web pages for the intranet as her background was in writing and not web design technology.

37.     In accordance with the Vanguard culture of assuming Black people were unintelligent, inferior and destined to fail, McClellan purposefully created an environment in which Kelly would not be able to succeed.  McClellan refused to reinstate Kelly's duties as a writer, transfer her back to the Defined Benefit Services Department or provide Kelly with the necessary skills training so that Kelly could perform the highly technical functions of her new job duties.

38.     None of Kelly's Caucasian counterparts were involuntarily transferred to other departments where they were required to change their duties from writing to web designing.

39.     Also, in the year she was transferred to a new position with no training, Kelly's job performance was not evaluated until the end of the year, contrary to Vanguard policy.

40.     At the end of the year, Kelly was rated "needs further development" with no reference to, or consideration of, her performance prior to her involuntary transfer and the drastic shift in her job duties , which rating negatively affected her compensation.

41.     Kelly filed grievances and met with Crew Relations to discuss the disparate and discriminatory treatment she was experiencing; however, in conformity with Vanguard's standard practices as it relates to complaints of race discrimination by Black employees, no investigation was conducted by Crew Relations and no steps were taken to address her concerns.

42.     Kelly met with Sharon Barnes ("Barnes"), an African American female diversity officer at Vanguard on a monthly basis regarding the pervasive discrimination that she faced at Vanguard.  Barnes shared similar stories of discriminatory conduct and informed her that she was not alone as Barnes had been meeting with numerous African American employees who were complaining about the disparate treatment they were receiving from their managers.  The message to Kelly was clear: discrimination at Vanguard was rampant and Vanguard had no intention of rectifying its racially hostile work environment, but rather it relied on African American "diversity officers" to placate Black employees and sweep their complaints under the rug.

43.     In addition to creating an environment in which Kelly was doomed to fail, McClellan, like other Caucasian supervisors of Black employees, also erected barriers that prevented Kelly from performing her job duties and that prohibited her from having contact with management-level employees.  For example, McClellen gave Kelly an assignment to contact several Vanguard managers to gather information from various departments and prepare a report that was going to be presented to another Vanguard manager, Barbara Fallon Walsh ("Walsh"), a Caucasian female.  As requested, Kelly obtained the necessary information.  Kelly subsequently received an angry telephone call from McClellan demanding to see her immediately.  Upon reporting to McClellan's office, Kelly was told that the managers that she contacted were complaining that she contacted them directly and that she should not have further contact with any managers.  Kelly's Caucasian non-management counterparts, however, were able to, and continued to have, contact with Vanguard management employees as needed to complete their assignments.

44.     This incident was noted in Kelly's subsequent employment evaluations and she was turned down for several positions in other areas of the company based on the negative performance evaluations she received from McClellan.

45.     Despite Kelly's repeated requests for remedial action and a tolerable working environment, Vanguard ignored her cries for help and, instead, continued its discriminatory practices, fostering a corporate culture of racially-charged stereotypes, beliefs and actions which detrimentally impacted Kelly and the other Plaintiffs and rendered them unable to perform their job requirements.

46.     Kelly was eventually forced to resign because of Vanguard's failure to act and its willful blindness to the pattern of discriminatory practices and retaliation rampant at its Malvern headquarters.

47.     Based on the foregoing, Vanguard violated the provisions of 42 U.S.C. §1981, et seq. ("Section 1981"), in that it created, permitted, tolerated, encouraged and fostered discriminatory treatment of Kelly based on her race and a hostile, demeaning, degrading and demoralizing environment at Vanguard as evidenced by the above-described discriminatory and retaliatory acts.

48.     The discriminatory acts were created by and known to Vanguard's supervisory personnel and human resources personnel, who took no meaningful or effective action to terminate the offending behavior, to remove the offending environment or to discipline the offending employees, but instead retaliated against Kelly, dissuading her from making or supporting charges of discrimination.

49.     As a consequence of the hostile and discriminatory environment, which was supported and encouraged by Vanguard's actions and failures to act, Kelly has

suffered mental, physical and emotional distress, including, but not limited to, sleeplessness, nervousness, headaches, hysteria, depression and the worsening of her medical condition, as well as humiliation, ridicule, a loss of self-respect and confidence, physical injury and damage, all of which have negatively affected her work product and ability to fully and effectively perform her job duties and responsibilities and have caused great damage to her career and professional standing.

50.     As a consequence of the hostile, discriminatory and retaliatory environment, which was supported and encouraged by Vanguard's actions and failure to act, Kelly was forced to seek medical attention for her mental, physical and emotional distress and was placed on short term disability.

51.     Said violations were intentional and willful.

52.     Said violations warrant the imposition of punitive damages because of Defendant's malice and reckless indifference to Kelly's federally protected rights.

53.     As a direct and proximate result of Vanguard's violations of Section 1981, Kelly has sustained the injuries, damages and losses set forth herein and has incurred attorney's fees and costs.

### TIFFANY GILBERT

54.     Plaintiff Tiffany Gilbert ("Gilbert") began her career at Vanguard as a Customer Services Representative in December 2004.

55.     Her duties included, *inter alia*, assisting clients with questions regarding their portfolios and investments at Vanguard.

56.   Throughout her employment at Vanguard, Gilbert, like all of the Plaintiffs in this action, was treated in a condescending, belittling and offensive manner by her Caucasian supervisors while her Caucasian counterparts were not.

57.   Shortly after she began her employment with Vanguard, she noticed that African American Customer Services Representatives were treated differently from their Caucasian counterparts.

58.   On more than one occasion, Gilbert heard her Caucasian supervisors make derogatory comments about African American men.

59.   Gilbert herself became the recipient of race-based discrimination when she was given negative performance ratings and placed on probation for alleged technical violations of Vanguard protocol, while her Caucasian counterparts were not given negative evaluations for engaging in the same or similar conduct.

60.   Intensifying the discrimination experienced by Gilbert, she was isolated and shunned by her Caucasian supervisors who constantly questioned her and made demeaning comments concerning her intelligence and her ability to complete assignments, but they did not do the same with her Caucasian counterparts.

61.   As an example, Gilbert was required to take short term disability after she was diagnosed with breast cancer.

62.   Upon returning, Gilbert asked her Caucasian supervisors and colleagues to assist her in learning new processes and procedures that were implemented during her absence and for which she would be held accountable as to her ability to master those processes.

63.    Although initially placed on a sporadic training schedule, Gilbert's Caucasian supervisors and colleagues offered little or no assistance to Gilbert. Instead, Gilbert's Caucasian supervisors devoted their efforts to training her Caucasian counterparts on the new processes and procedures implemented during her absence.

64.    Particularly in light of the demeaning comments and blatantly disparate treatment by Gilbert's Caucasian supervisors, Gilbert's work suffered.  Even though Vanguard intentionally failed to provide her with the proper and necessary training that was provided to her white counterparts, she was given negative performance ratings, which affected her rate of compensation and her ability to transfer to other departments within Vanguard.

65.    As a result of the cumulative pattern of discrimination exhibited by Gilbert's Caucasian managers, Gilbert was forced to take a short term disability leave for clinical depression with a risk of suicide caused by the condescending, belittling and offensive manner in which she was treated at Vanguard.

66.    In March 2011, following the expiration of her short term disability, Gilbert took an administrative leave from Vanguard after she was advised by her psychiatrist and psychologist not to return to Vanguard.

67.    After driving Gilbert to a fragile psychological state through unrelenting discriminatory treatment and after intentionally creating a hostile environment and withholding essential training to ensure Gilbert's failure, Vanguard terminated Gilbert.

68.    The pattern of discriminatory practices perpetuated by Vanguard's supervisory personnel, its failure to act, and its willful blindness to the pattern of discriminatory practices and retaliation rampant at its Malvern headquarters, which

fostered a corporate culture of racially-derogatory stereotypes, beliefs and actions had an extreme detrimental impact on Gilbert.

69.    Based on the foregoing, Vanguard violated the provisions of 42 U.S.C. §1981, et seq. ("Section 1981"), in that it created, permitted, tolerated, encouraged and fostered discriminatory treatment of Gilbert based on her race and a hostile, demeaning, degrading and demoralizing environment at Vanguard as evidenced by the above-described improper and discriminatory acts.

70.    The discriminatory acts were committed by supervisory personnel and were known to Vanguard's management and human resources personnel, who took no meaningful or effective action to terminate the offending behavior, to remove the offending environment or to discipline the offending employees.

71.    As a consequence of the hostile, discriminatory and retaliatory environment, which was supported and encouraged by Vanguard's actions and failures to act, Gilbert has suffered mental, physical and emotional distress, including, but not limited to, sleeplessness, nervousness, headaches, hysteria, depression and the worsening of her medical condition, as well as humiliation, ridicule, a loss of self-respect and confidence, physical injury and damage, all of which have negatively affected her work product and ability to fully and effectively perform her job duties and responsibilities and have caused great damage to her career and professional standing.

72.    As a consequence of the hostile and discriminatory environment, which was supported and encouraged by Vanguard's actions and failures to act, Gilbert became suicidal and was forced to seek medical attention for her mental, physical and emotional distress and was placed on short term disability.

73.    Said violations were intentional and willful.

74.    Said violations warrant the imposition of punitive damages because of Vanguard's malice and reckless indifference to Gilbert's federally protected rights.

75.    As a direct and proximate result of Vanguard's violations of Section 1981, Gilbert has sustained the injuries, damages and losses set forth herein and have incurred attorney's fees and costs.

### TELISSA LINDSEY

76.    Plaintiff Telissa Lindsey ("Lindsey") began her career at Vanguard in July 2005 as a Line Manager responsible for managing a team of investment managers. Her duties included oversight of compliance requirements, client complaints, portfolio and trust management and assisting clients with brokerage and retail services.

77.    Consistent with Vanguard's discriminatory practices towards Black employees, shortly after she began her employment with Vanguard, Lindsey observed that she and the other Black Line Managers were treated differently from their Caucasian peers.

78.    Specifically, Lindsey observed that she and the other Black Line Managers were treated in a condescending and offensive manner by their Caucasian supervisors while their Caucasian peers were not.

79.    In February 2008, Lindsey was supervised by Michael McLaughlin ("McLaughlin"), a Caucasian male and a Vanguard Principal.

80.    McLaughlin assigned several projects to Lindsey and Evan Swartley ("Swartley"), a Caucasian male Line Manager who also reported to McLaughlin.

81.     On numerous occasions, McLaughlin took assignments away from Lindsey and gave them to Swartley after Lindsey had invested a significant amount of time and effort on the projects.

82.     Not content to discriminate against Lindsey by merely divesting her of work responsibilities and allowing her white peer to reap the benefits of her labor, on one occasion, McLaughlin and Swartley went to Lindsey's direct manager, Karen Risi ("Risi"), a Caucasian female Vanguard Principal, and complained that Lindsey was "difficult to get along with" and "not a team player." Citing an example, McLaughlin and Swartley stated that Lindsey decided on her own to work on projects that she had not been assigned. When confronted by Risi, Lindsey produced emails confirming that McLaughlin had indeed assigned Lindsey the projects in question. McLaughlin and Swartley were not disciplined for their false accusations and discriminatory treatment.

83.     After several months of enduring disparate treatment by McLaughlin, Lindsey complained to Risi that she was being discriminated against by McLaughlin because of her race and gender.

84.     Lindsey also complained of the disparate treatment by McLaughlin to John Marcante, ("Marcante"), a Caucasian male Vanguard Principal and the department head for Flagship Services.

85.     In addition, Lindsey complained of the disparate treatment by McLaughlin to Lynda Risser ("Risser"), a Caucasian female and Senior Manager within Vanguard Crew Relations.

86.     Risi, Marcante and Risser all failed to investigate Lindsey's claims or the discrimination that Risi witnessed firsthand and failed to take any corrective action.

87.     Beginning in May 2008, Lindsey began reporting to John Buhl ("Buhl"), a Caucasian male and Vanguard Principal, from whom she experienced the same discriminatory treatment that she experienced under McLaughlin.

88.     Consistent with the Vanguard corporate culture in which Black employees were considered less intelligent and unworthy of training or mentoring, Buhl persistently demeaned Lindsey instead.

89.     On one occasion, after a Senior Manager meeting, Buhl scolded Lindsey for asking questions regarding a project on which Swartley was working.  In speaking privately with the other employees at the meeting regarding her questions, Lindsey learned that none of the senior Managers or Swartley believed that the questions were inappropriate.  In fact, they stated to her that her questions assisted them in better understanding the scope of the project.

90.     On another occasion, Buhl insulted Lindsey by telling her that she was not smart enough to understand the meaning of an engineering joke he was telling to a Caucasian male that had just left his office.

91.     On yet another occasion, Buhl told Lindsey that she had a problem getting along with people and he cited McLaughlin and Swartley, Lindsey's discriminators, as examples.  During this exchange, Buhl specifically referenced the incident where Lindsey reported McLaughlin for discriminatory conduct as an example of her inability to get along with people at Vanguard.

92.     Lindsey then met with Risser in Crew Relations a second time as a result of Buhl's discriminatory treatment and the hostile work environment she was

20

experiencing and advised Risser that Buhl was retaliating against her because she reported McLaughlin's discriminatory conduct.

93.     Shortly after reporting to Risser about Buhl's continuing discrimination and retaliation, Lindsey received a call from Marcante, asking her to meet with him.  During that meeting, Marcante stated that Lindsey's name came up as a possible person to lead a special project on which the Retail Division was working, and Marcante asked if Lindsey would be interested in working for Tim Thornton ("Thorton"), a Caucasian male. Lindsey accepted the offer, however, she learned shortly thereafter from Thornton that Marcante had previously called Thornton and requested that he "take Lindsey off [his] hands."

94.     Thornton subsequently assigned Lindsey to report to James Kearney ("Kearney"), a Caucasian male and Vanguard Principal.

95.     Consistent with the Vanguard corporate culture in which Black employees were considered less intelligent and "problems" to be taken off of their supervisors' hands, Kearney almost immediately demonstrated his animosity towards Lindsey and his behavior mirrored that of McLaughlin and Buhl.  Lindsey was the only African American in her position and was criticized by Kearney for not getting along with her Caucasian counterparts (all of whom were white males).  In relaying his criticism to her, Kearney stated: "I know you have had this problem before," again referencing her prior complaints of discrimination and retaliation.

96.     Thereafter, Kearney and Lindsey got into a heated disagreement wherein she told him that she was experiencing discrimination because of her gender and

ethnicity. Kearney screamed at Lindsey for accusing him of discriminatory conduct and Lindsey left the room distraught.

97.   After that incident, Kearney retaliated by taking work from Lindsey and her team. In fact, approximately eighty percent (80%) of Lindsey's work was taken away from her and her team and given to Caucasian men and women in retaliation for her complaints of discriminatory treatment.

98.   Lindsey reported to Thornton that she was being discriminated against by Kearney and that eighty percent (80%) of her work had been taken away from her.

99.   Indicative of the racially hostile culture that pervaded Vanguard, Thornton told Lindsey that she could either accept the discriminatory treatment and decreased responsibilities or transfer to another department. In accordance with the Vanguard corporate culture, rather than take steps to correct the racially hostile environment and to discipline the employees who engaged in such conduct, Thornton told Lindsey that the only department that she could move to would be Institutional Services because she now had a reputation in Retail Services and no one else would accept her.

100.   Aside from the hostile work environment and demeaning discriminatory treatment Lindsey suffered directly at the hands of McLaughlin, Buhl, Kearney and Thornton, Lindsey was also disparately impacted by Vanguard's inconsistent enforcement of facially-neutral qualifications for promotion. Specifically, Lindsey was held to a higher standard than her Caucasian peers by the alleged requirement that she participate in Vanguard's Senior Management Development Program ("SMDP") in order to be eligible for promotion.

101.   Ostensibly, Vanguard implemented the SMDP for Senior Managers to complete before being promoted to the coveted position of Principal.  In reality, the SMDP functioned as merely another discriminatory barrier for African American senior managers to overcome in order to become a Principal, which barrier did not exist for Caucasian senior managers.  Indeed, Lindsey observed that Vanguard promoted a significant number of white male managers to Principal who did not go through SMDP. Within her own department, Buhl and Kearney were promoted to Principal although neither of them ever went through SMDP.  In contrast, Lindsey noticed that no African American managers were promoted to Principal without completing the program.

102.   Despite completing SMDP, Lindsey was never promoted to Principal.

103.   Consequently, the persistent discriminatory and demeaning treatment and hostile work environment to which she was subjected forced Lindsey to resign from Vanguard in September 2010.

104.   Vanguard's failure to take any corrective action and its willful blindness to the pattern of discriminatory practices and retaliation rampant at its Malvern headquarters created and fostered a corporate culture of racially-derogatory stereotypes, beliefs and actions which detrimentally impacted Lindsey, rendered her unable to perform her job requirements and eventually forced her to resign.

105.   During Lindsey's exit interview with Crew Relations, she spoke with Risser.  In the course of the interview, Risser admitted that Vanguard has a significant number of bad managers who treat African American employees unfairly.  She also stated that this is a problem in part because Vanguard is "such a big company."

106. Based on the foregoing, Vanguard violated the provisions of 42 U.S.C. §1981, et seq. ("Section 1981"), in that it created, permitted, tolerated, encouraged and fostered discriminatory treatment of Lindsey based on her race and a hostile, demeaning, degrading and demoralizing environment at Vanguard as evidenced by the above-described improper and discriminatory acts. Moreover, Vanguard created and permitted Lindsey's supervisors and other management level personnel to retaliate against her for the exercise of her federally protected rights.

107. The discriminatory and retaliatory acts were created by and known to Vanguard's supervisory personnel and human resources personnel, who took no meaningful or effective action to terminate the offending behavior, to remove the offending environment or to discipline the offending employees.

108. As a consequence of the hostile and discriminatory environment, which was supported and encouraged by Vanguard's actions and failure to act, Lindsey has suffered mental, physical and emotional distress, including, but not limited to, sleeplessness, nervousness, headaches, hysteria, depression and the worsening of her medical condition, as well as humiliation, ridicule, a loss of self-respect and confidence, physical injury and damage, all of which have negatively affected her work product and ability to fully and effectively perform her job duties and responsibilities and have caused great damage to her career and professional standing.

109. Said violations were intentional and willful.

110. Said violations warrant the imposition of punitive damages because of Vanguard's malice and reckless indifference to Lindsey's federally protected rights.

24

111.   As a direct and proximate result of Vanguard's violations of Section 1981, Lindsey has sustained the injuries, damages and losses set forth herein and have incurred attorney's fees and costs.

## CRYSTAL TUCKER

112.   Plaintiff Crystal Tucker ("Tucker") began her career at Vanguard in October 2000 as a Supervisor in the Internal Audit Department.

113.   Tucker was promoted to Manager and then Senior Manager.

114.   As Senior Manager, Tucker's duties included, *inter alia*, supervising employees and managers in the Internal Audit Department.

115.   During her Vanguard tenure, Tucker observed African American managers and employees being treated differently from their Caucasian counterparts.

116.   Consistent with Vanguard's corporate culture, which tolerated and encouraged discriminatory practices towards African American employees and retaliation for complaints of discrimination, Tucker was treated in a condescending, belittling and offensive manner by her Caucasian supervisors while her Caucasian counterparts were not.

117.   While Tucker was a Supervisor at Vanguard, Robert Mainardi ("Mainardi") a Caucasian male with the same qualifications as Tucker was hired two levels above her as a Senior Manager without explanation.  Mainardi previously worked with Tucker at Aetna Insurance Company prior to being hired at Vanguard where Tucker and Mainardi were peers.

118.   While working as a Supervisor in Internal Audit, Tucker was frequently subjected to derogatory comments by her Supervisor, James Hayes ("Hayes").  On one

25

occasion, Hayes threatened to change her performance appraisal because of an innocent comment made by Tucker in a meeting that he did not like. Tucker informed the Department Head as well as Crew Relations of the incident and Tucker was assigned a new supervisor. Upon information and belief, Hayes was not disciplined for his hostile and discriminatory treatment of Tucker.

119.   While Tucker was working as a Manager in Internal Audit, a position for a Senior Manager became available. Tucker and Nina Gordon ("Gordon"), another African American female manager, were told that they would not be considered for the position. The explanation given was that the department was looking for expertise both Tucker and Gordon did not possess. The position remained vacant for an extended period of time and was eventually given to Mainardi even though Mainardi and Tucker possessed similar qualifications and were peers at their previous place of employment.

120.   Also, while working as a Manager, Tucker presented her supervisor, Scott Case ("Case"), a Caucasian male, with a proposal for a reduced work schedule over a period of six months (4-day work week at 80% pay) after returning from maternity leave. Tucker's request was summarily denied. Approximately four months later, a similarly-situated Caucasian manager peer presented a proposal for a reduced work schedule for an indefinite period of time (3-day work week at 60% pay). The Caucasian manager peer's proposal was granted with no explanation to Tucker.

121.   While working as both a Manager and Senior Manager at Vanguard, Tucker spoke with her supervisors on several occasions about career development and advancement at Vanguard. Tucker told her supervisors that the lack of racial diversity at senior levels within the organization sent the message that minorities had few

opportunities for advancement.  One supervisor, Frank Satterthwaite ("Satterthwaite"), agreed with Tucker and stated that he hoped that the organization would have made more progress since his arrival at the organization in placing minorities in senior level positions.

122.    When Tucker was finally promoted to Senior Manager, she assumed the same work load and responsibilities as her former supervisor Case, however, she was kept at a lower level than Case.

123.    On another occasion, after Tucker rotated to Retail Operations within the Retail Investor Group, Tucker was told by her new Caucasian supervisor at a bi-annual performance review: "This is a big job, and I worry about your ability to do it because of everything you have going on in your personal life.  Your husband just had surgery, you've had death in your family, your children do not attend daycare and there is your health condition to consider."

124.    Although Tucker was previously diagnosed with Fibromyalgia, it never affected her ability to perform her employment-related responsibilities, nor had her family-related responsibilities ever affected her performance.  Indeed, Tucker never raised these concerns and similar concerns were not raised with Caucasian or male employees.

125.    Despite the fact that Tucker reported the statement to Crew Relations, they refused to investigate her complaint and, instead, justified the blatantly discriminatory comment as an "offer to help her"[2] rather than a statement that called into

---

[2] How discouraging Tucker from assuming a greater position or additional responsibilities was meant to "help" her was not explained.

question her performance capabilities and one that stereotyped her based on her protected characteristics.

126. Consistent with Vanguard's corporate culture of treating Black employees as inferior and incapable of handling leadership roles, Tucker was told by her Caucasian supervisor as she assumed responsibility for managing her team that she was "out of line" for managing an employee with performance issues directly within her reporting chain. Despite having more years of leadership experience and more in-service time within Vanguard than a Caucasian male peer, Tucker was told that she should listen to and allow the Caucasian male peer, who had no supervisory relationship with the underperforming employee, to handle the issue.

127. In addition, Tucker met with a team leader within her reporting chain for a "skip-level meeting." At the meeting, it came to Tucker's attention that an African American female team leader with more than ten years work experience, an MBA and successful performance reviews had not been considered for promotion to management while Caucasian males with only high school diplomas and less experience had advanced to the managerial level.

128. While at Vanguard, Tucker became a mentor to many Black employees who frequently sought her advice for dealing with discriminatory remarks made by their managers. Tucker referred many of these employees to Vanguard's Chief Diversity Officer and Crew Relations to report these issues; however, consistent with Vanguard's willful blindness to discrimination against Black employees, the remarks were never investigated and Vanguard never took any corrective action to stop the hostile work environment and discriminatory treatment of Black employees at Vanguard.

129. Moreover, as a member of Vanguard's leadership team, Tucker had the opportunity to see the employment files of numerous employees, and she noticed pay discrepancies between African American and Caucasian employees and between women and their male counterparts. In fact, Tucker received two pay adjustments outside of the regular promotions schedule to decrease, but not to eliminate, the significant wage gap between herself and her Caucasian male peers – a meager attempt by Vanguard to avoid the appearance of discriminatory treatment, while ignoring the root causes: widespread discriminatory animus among management fostered by Vanguard's consistent inaction and wide latitude and discretion granted by Vanguard to those same managers to discriminate at will against Black employees in pay, promotion, development opportunities and disciplinary actions.

130. Also while she was employed at Vanguard, Tucker was involved in recruiting diverse candidates for Vanguard employment. In her recruiting capacity, Tucker noticed that diverse candidates were often denied employment for vague or unexplained reasons. She also had occasion to speak with other diversity recruiters at Vanguard and heard similar complaints regarding lack of information provided by Vanguard management when rejecting qualified candidates from diverse backgrounds.

131. Vanguard's tolerance of discriminatory practices created and fostered a corporate culture of racially-derogatory stereotypes, beliefs and actions which detrimentally impacted Tucker and rendered her unable to perform her job requirements.

132. Tucker was eventually forced to resign because of Vanguard's racially hostile work environment and its pattern of discriminatory practices.

29

133.   Based on the foregoing, Vanguard violated the provisions of 42 U.S.C. §1981, et seq. ("Section 1981"), in that it created, permitted, tolerated, encouraged and fostered discriminatory treatment of Tucker based on her race, retaliation against Tucker for the exercise of her federally-protected rights and her encouragement of others to exercise their rights and a hostile, demeaning, degrading and demoralizing environment at Vanguard as evidenced by the above-described improper and discriminatory and retaliatory acts.

134.   The discriminatory and retaliatory acts were created by and known to Vanguard' s supervisory personnel, management and human resources personnel, who took no meaningful or effective action to terminate the offending behavior, to remove the offending environment or to discipline the offending employees.

135.   As a consequence of the hostile, discriminatory and retaliatory environment, which was supported and encouraged by Vanguard's actions and failure to act, Tucker has suffered mental, physical and emotional distress, including, but not limited to, sleeplessness, nervousness, headaches, hysteria, depression and the worsening of her medical condition, as well as humiliation, ridicule, a loss of self-respect and confidence, physical injury and damage, all of which have negatively affected her work product and ability to fully and effectively perform her job duties and responsibilities and have caused great damage to her career and professional standing.

136.   Said violations were intentional and willful.

137.   Said violations warrant the imposition of punitive damages because of Vanguard's malice and reckless indifference to Tucker's federally protected rights.

30

138. As a direct and proximate result of Vanguard's violations of Section 1981, Tucker has sustained the injuries, damages and losses set forth herein and have incurred attorney's fees and costs.

## TRACEY PARKER

139. Plaintiff Tracey Parker ("Parker") began her career at Vanguard in May 2008 as an administrative assistant to an African American manager named Randall Brown ("Brown") and a Caucasian manager named Susan Anderson ("Anderson").

140. Throughout her employment, Parker was subjected to a multitude of discriminatory comments by Anderson and/or other Caucasian employees.

141. On multiple occasions, Anderson subjected Parker to demeaning comments that Anderson made about men of African descent. Some of Anderson's comments were made generally about men of African descent and some of Anderson's comments targeted individual men of African descent who worked at Vanguard with Parker.

142. In addition to being subjected to demeaning comments about persons in her protected class, Parker was treated differently from her Caucasian administrative assistant counterparts. Specifically, Caucasian managers in addition to Anderson criticized Parker for allegedly not being a "team player" whereas her Caucasian counterparts were not equally criticized. The source of this criticism involved Parker allegedly not being available to assist her Caucasian administrative counterparts with the completion of their workloads, despite the fact that Parker was responsible for supporting a total of 22 managers and over 600 companies. By contrast, her Caucasian

administrative counterparts only supported approximately 5 managers and no more than 100 companies

143.   In addition, Anderson encouraged the other Caucasian managers in the department to provide Parker with negative reviews.

144.   Anderson also treated Parker in a hostile and condescending manner unlike the manner in which she treated Parker's Caucasian counterparts.

145.   As a further example of the overall discriminatory culture at Vanguard, on another occasion, after Parker ran into a Caucasian female employee named Jean Young ("Young") while Parker was leaving the ladies restroom with three other African American female employees, including co-Plaintiff Kelly, Young asked "what are you girls doing in there - having a party?", implying that the African American employees were simply trying to avoid work and using the condescending term "girls" instead of women.  Caucasian employees were not questioned in the same manner.

146.   Vanguard's pattern of discriminatory practices and its inaction with regard to discriminatory treatment about which it knew or should have known created and fostered a corporate culture of racially discriminatory stereotypes, beliefs and actions which detrimentally impacted Parker and rendered her unable to perform her job requirements.

147.   Parker was eventually forced to resign because of Vanguard's willful blindness to the pattern of discriminatory practices rampant at its Malvern headquarters.

148.   Based on the foregoing, Vanguard violated the provisions of 42 U.S.C. §1981, et seq. ("Section 1981"), in that it created, permitted, tolerated, encouraged and fostered discriminatory treatment of Parker based on her race and a hostile, demeaning,

degrading and demoralizing environment at Vanguard as evidenced by the above-described improper and discriminatory acts.

149.   The discriminatory acts were created by and known to Vanguard's supervisory personnel, who took no meaningful or effective action to terminate the offending behavior, to remove the offending environment or to discipline the offending employees.

150.   As a consequence of the hostile and discriminatory environment, which was supported and encouraged by Vanguard's actions and failures to act, Parker has suffered mental, physical and emotional distress, including, but not limited to, sleeplessness, nervousness, headaches, hysteria, depression and the worsening of her medical condition, as well as humiliation, ridicule, a loss of self-respect and confidence, physical injury and damage, all of which have negatively affected her work product and ability to fully and effectively perform her job duties and responsibilities and have caused great damage to her career and professional standing.

151.   Said violations were intentional and willful.

152.   Said violations warrant the imposition of punitive damages because of Vanguard's malice and reckless indifference to Parker's federally protected rights.

153.   As a direct and proximate result of Vanguard's violations of Section 1981, Parker has sustained the injuries, damages and losses set forth herein and have incurred attorney's fees and costs.

### TANYA GREGORY

154.   Plaintiff Tanya Gregory ("Gregory") began her career at Vanguard in February 2005 as a Recruiter after leaving the United States Air Force.

155.   Thereafter, Gregory was reassigned to Vanguard's Leadership
Development Department as a Project Administrator.

156.   Next, Gregory was reassigned to Vanguard's University Department in the
Human Resources Division as an Instructional Designer.

157.   As an Instructional Designer, Gregory's duties included the design and
development of training procedures for client development and information technology.

158.   During her employment with Vanguard, Gregory has been subjected to a
multitude of discriminatory comments and discriminatory conduct by Vanguard's
Caucasian employees.

159.   For instance, Gregory's Supervisor at Vanguard, Christa Bruel ("Bruel"), a
Caucasian female, ignored several requests for career guidance, while spending an
abundance of time giving guidance to Gregory's Caucasian peers and assisting in their
advancement and development at Vanguard.

160.   Gregory complained to Crew Relations about the favoritism shown to her
Caucasian peers by Bruel.  However, consistent with Vanguard's corporate culture of
tolerating racial discrimination, instead of addressing the issue with Bruel, Gregory was
reassigned to another department.

161.   In direct retaliation for Gregory's complaints to Crew Relations, Bruel's
behavior became very hostile toward Gregory.  Bruel ordered Gregory to report to her
before she went to lunch, before she went home and any other time that she needed to
be away from the office.   Before Gregory lodged her complaint with Crew Relations,
Bruel never asked Gregory to report to her before leaving the office.

162.   On another occasion, consistent with the Vanguard corporate culture of regarding Black employees as inferior and incapable, a Caucasian Recruiter, Barbara Bronson ("Bronson"), asked Gregory whether she thought that she was only hired at Vanguard because she was Black.

163.   Gregory was also treated in a condescending and belittling manner by her Caucasian supervisor while her Caucasian counterparts were not.

164.   Gregory and two Caucasian females applied for management positions with Vanguard.

165.   Both of the Caucasian females were chosen for management positions while Gregory was not, even though she was equally qualified for the positions.

166.   Gregory reported these incidents to a representative from Crew Relations.

167.   Shortly thereafter, she met with the representative from Crew Relations and told her about the comments and condescending, belittling and discriminatory behavior.

168.   Despite Gregory's complaints, no investigation was performed by Crew Relations regarding her claims.

169.   Vanguard's tolerance of and willful blindness to the pattern of discriminatory and retaliatory practices rampant at its Malvern headquarters created and fostered a corporate culture of racially-discriminatory stereotypes, beliefs and actions which detrimentally impacted Gregory and rendered her unable to perform her job requirements.

170.   Gregory was eventually forced to resign because of Vanguard's pattern of discriminatory and retaliatory practices.

171.   Based on the foregoing, Vanguard violated the provisions of 42 U.S.C. §1981, et seq. ("Section 1981"), in that it created, permitted, tolerated, encouraged and fostered discriminatory treatment of Gregory based on her race, retaliation for Gregory's exercise of her federally protected rights and a hostile, demeaning, degrading and demoralizing environment at Vanguard as evidenced by the above-described improper and discriminatory acts.

172.   The discriminatory and retaliatory acts were created by and known to Vanguard's supervisory personnel and human resources personnel, who took no meaningful or effective action to terminate the offending behavior, to remove the offending environment or to discipline the offending employees.

173.   As a consequence of the hostile, retaliatory and discriminatory environment, which was supported and encouraged by Vanguard's actions and failures to act, Gregory has suffered mental, physical and emotional distress, including, but not limited to, sleeplessness, nervousness, headaches, hysteria, depression and the worsening of her medical condition, as well as humiliation, ridicule, a loss of self-respect and confidence, physical injury and damage, all of which have negatively affected her work product and ability to fully and effectively perform her job duties and responsibilities and have caused great damage to her career and professional standing.

174.   Said violations were intentional and willful.

175.   Said violations warrant the imposition of punitive damages because of Vanguard's malice and reckless indifference to Gregory's federally protected rights.

176.   As a direct and proximate result of Vanguard's violations of Section 1981, Gregory has sustained the injuries, damages and losses set forth herein and have incurred attorney's fees and costs.

### CHERYL INGRAM

177.   Plaintiff Cheryl Ingram ("Ingram") began her career at Vanguard in December 2006 as an Annual Plan Reporting Associate.

178.   As an Annual Plan Reporting Associate, Ingram's duties included monitoring, reporting and auditing pension plan and 401(k) plan assets.

179.   Throughout her employment with Vanguard, Ingram's evaluations have always been excellent.

180.   Ingram's supervisor is Dianne Konnick ("Konnick"), a Caucasian female.

181.   During her employment with Vanguard, Ingram has been subjected to a multitude of discriminatory comments and discriminatory conduct by Vanguard's Caucasian employees.

182.   For instance, Nicole Hinton ("Hinton"), a Caucasian female, was hired directly out of college in 2008 to the position of Annual Plan Reporting Associate. However, Hinton was promoted to a higher position after just one year without explanation even though Ingram had seventeen years of experience in the field with excellent employment evaluations.

183.   Ingram was absent from work on short term disability from January 6, 2011 to February 14, 2011 for stress-related reasons.  Upon her return to Vanguard, Ingram's work was excessively scrutinized and criticized, and she was given a warning within two weeks of her return to Vanguard.

184.    Ingram has observed several of her Caucasian peers be absent from work on short term disability for various health related reasons, including stress, and return to work without being placed under the same scrutiny to which Ingram was subjected.

185.    Ingram complained to Crew Relations about the disparity in treatment she experienced; however, no investigation or action was taken by Crew Relations to address her concerns.

186.    Ingram was also treated in a condescending and belittling manner by her Caucasian supervisor while her Caucasian counterparts were not.

187.    Vanguard's pattern of discriminatory practices created and fostered a corporate culture of racially discriminatory stereotypes, beliefs and actions which detrimentally impacted Ingram and rendered her unable to perform her job requirements.

188.    Ingram was eventually forced to resign because of Vanguard's pattern of discriminatory and retaliatory practices.

189.    Based on the foregoing, Vanguard violated the provisions of 42 U.S.C. §1981, et seq. ("Section 1981"), in that it created, permitted, tolerated, encouraged and fostered discriminatory treatment of Ingram based on her race, retaliation based on Ingram's exercise of her federally protected rights and a hostile, demeaning, degrading and demoralizing environment at Vanguard as evidenced by the above-described improper and discriminatory acts.

190.    The discriminatory and retaliatory acts were created by and known to Vanguard's supervisory personnel and human resources personnel, who took no

meaningful or effective action to terminate the offending behavior, to remove the offending environment or to discipline the offending employees.

191.   As a consequence of the hostile, retaliatory and discriminatory environment, which was supported and encouraged by Vanguard's actions and failures to act, Ingram has suffered mental, physical and emotional distress, including, but not limited to, sleeplessness, nervousness, headaches, hysteria, depression and the worsening of her medical condition, as well as humiliation, ridicule, a loss of self-respect and confidence, physical injury and damage, all of which have negatively affected her work product and ability to fully and effectively perform her job duties and responsibilities and have caused great damage to her career and professional standing.

192.   Said violations were intentional and willful.

193.   Said violations warrant the imposition of punitive damages because of Vanguard's malice and reckless indifference to Ingram's federally protected rights.

194.   As a direct and proximate result of Vanguard's violations of Section 1981, Ingram has sustained the injuries, damages and losses set forth herein and have incurred attorney's fees and costs.

## PLAINTIFFS' CLAIMS UNDER THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. 1981

195.   Plaintiffs restate paragraphs 1-195, inclusive, as though set forth here in full.

196.   Vanguard discriminated against the Plaintiffs by denying them the same rights as enjoyed by Caucasian employees with respect to the terms and conditions of their employment relationship with Vanguard and to the enjoyment of all benefits,

privileges, terms and conditions of that relationship, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended.

197.   Vanguard retaliated against the Plaintiffs and other Black employees for the exercise of their federally protected rights, including their complaints of race discrimination and harassment.  Vanguard's conduct and failure to take corrective action for such retaliation discouraged each of them from making or supporting their own charges of discrimination.

198.   Vanguard's conduct has been intentional, deliberate, willful and conducted in callous disregard of the rights of the Plaintiffs.

199.   By reason of Vanguard's discrimination, in addition to the relief described above, the Plaintiffs are entitled to all legal and equitable remedies available under Section 1981, including but not limited to damages for mental anguish and punitive damages.

### JURY DEMAND

200.   Plaintiffs hereby demand a trial by jury as to all issues so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that the Court:

a.   adjudge, decree and declare that Vanguard has engaged in illegal race discrimination and that the practices of Vanguard complained of herein are violative of the rights secured to the Plaintiffs;

b.   issue a permanent prohibitory injunction prohibiting Vanguard and its officers, agents, employees, and successors from engaging in any further unlawful

practices, policies, or customs of racial discrimination and retaliation complained or herein,

c.      enter judgment in favor of the Plaintiffs and against Vanguard for all available remedies and damages under law and equity, including, but not limited to, back pay, front pay, and past and future mental anguish and pain and suffering in amounts to be determined at trial;

d.      order Vanguard to pay punitive damages to the Plaintiffs in amounts to be at trial;

e.      order the payment of attorneys' fees and costs associated with the filing and prosecution of this action.

f.      grant such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

TUCKER LAW GROUP, LLC

By: _____
Joe H. Tucker, Jr., Esquire
Douglas K. Jenkins, Esquire
1617 JFK Boulevard, Suite 1700
Philadelphia, PA 19103
(215) 875-0609
Attorneys for Plaintiffs